09 CV 8114

187-09/PJG

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
KEN SHIPPING S.A.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski
Edward J. Carlson

RECEIVED
SEP 22 2009
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

KEN SHIPPING S.A.,

                              Plaintiff,

        -against-

EMCO SHIPPING a/k/a EMCO DENIZCILIK
TICARET VE SANAYI LTD. STI, a/k/a EMCO
DENIZCILIK and REGENT PROPERTIES SA,

                              Defendants.
------------------------------------------------------x

09 CV _____ (     )

**VERIFIED COMPLAINT**

Plaintiff Ken Shipping S.A. ("Ken Shipping"), as and for its Verified Complaint against Defendant Emco Shipping, also known as EMCO DENIZCILIK TICARET ve SANAYI LTD. STI, and also known as EMCO DENIZCILIK (hereinafter "EMCO"), and REGENT PROPERTIES SA (hereinafter "REGENT") alleges as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party and thus falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. This Court also has federal question jurisdiction pursuant to 28 U.S.C. §1331 because the action arises under the New York

Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff Ken Shipping was and still is a foreign business entity duly organized and existing under the laws of Panama with an address at Calle 50, No. 102 Edificio Universal, Planta Baja No. 6, Panama.

3.    At all times relevant hereto, Defendant EMCO was and still is a foreign business entity duly organized and existing under the laws of a foreign country with a registered address at Acibadem Mahallesi, Cinar Sokak Gulistan Sitesi, A9 Blok, Daire; 29, Uskudar, Istanbul, Turkey.

4.    At all times relevant hereto, Defendant REGENT was and still is a defunct foreign business entity which was originally created under the laws of the Marshall Islands by or at the behest of EMCO, was and still is operated out of EMCO's Istanbul offices, was controlled and dominated by EMCO and otherwise constitutes an alter ego and/or fictitious paying agent of EMCO.

## BACKGROUND FACTS

5.    Pursuant to a charter party dated February 1, 2006, Plaintiff Ken Shipping, as Owner of the M/V JUNIOR S, entered into a contract with the EMCO under which EMCO agreed to charter the vessel for a single time charter trip via Turkish ports to the Red Sea.  (A copy of the subject charter party is annexed hereto as **Exhibit 1** and hereinafter is referred to as "the Charter").

6.    The vessel was duly delivered into the service of Defendant EMCO, the cargo was lifted, carried and discharged at Aden, Yemen in 2006.

NYDOCS1/337772.1

7.     At discharge, cargo receivers made claim against the vessel for alleged damage to the cargo, claiming that the cargo had suffered from rust.

8.     In order to secure the release of the vessel, a bank guarantee was posted, on behalf of the Plaintiff and the vessel, to secure the claim of the cargo receivers in the sum of $900,000.

9.     Proceedings were commenced in Aden on behalf of cargo interests and against the Plaintiff and the vessel which were eventually settled for a payment in the principal sum of $500,000, which sum was tendered to cargo interests in resolution of the claim and against the return of the bank guarantee previously provided as security.

10.     In addition, defense costs, survey fees, court costs, etc. were also expended in connection with the posting of security and defense of the claim in the sum of approximately $80,011.

11.     The evidence surrounding the voyage indicates that the damage to the cargo was a result of either atmospheric rust that occurred when the stow was opened in Aden and the cargo experienced warm, humid air, and/or as a consequence of wetting to the cargo which was occasioned either during loading or discharge operations or other periods of handling of the cargo.

12.     Under the terms of the Charter, the Defendant EMCO agreed to assume responsibility for all such claims, by virtue of the incorporation of the Interclub Agreement in Clause 27 of the Charter.

13.     In accordance with Clause 27, all cargo claims as between the Plaintiff and the Defendant are to be settled in accordance with that agreement, as amended in May 1984 and by any subsequent modification or replacement thereof.

14.     Under the applicable Interclub Agreement, the Defendant EMCO, as Charterer, is responsible for all damages and cargo claims arising from or resulting from the handling of the cargo, and as the damages complained of by ultimate receivers here related to losses occasioned during handling, including but not limited to loading and/or discharging, the Defendant EMCO is properly responsible for the cargo claim originally lodged by the cargo receivers, and is liable to reimburse the Plaintiff for the amounts it paid in settlement of that claim, together with the additional costs and expenses incurred in defending and settling that action in Aden.

15.     The Charter provides for the application of English law and all disputes arising out of or in connection with the Charter are to be referred to arbitration in London in accordance with English law.

16.     This action is brought to obtain security for the claims identified herein, together with the additional sums which Plaintiff Ken Shipping will recover including anticipated attorneys' fees and costs in the English arbitration proceeding and interest, all of which are recoverable as part of Plaintiff Ken Shipping's claim under English law and pursuant to the governing legislation.

17.     Under English law, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

18.     Plaintiff Ken Shipping estimates, as nearly as can be computed, that the legal expenses and arbitral costs of prosecuting the claim against EMCO and defending the claim of Ken Shipping will be $ 165,000, and interest on the total exposure will be $101,501.92 (calculated at the rate of 7% for a period of 2.5 years, the estimated time for completion of the proceedings in England).

NYDOCS1/337772.1

### The Claim Against Regent as the Alter-Ego and Paying Agent of EMCO

19.    As outlined more fully below, Defendant EMCO operates and controls Defendant REGENT in a manner which results in their being considered a single economic entity, with REGENT being controlled and dominated by EMCO and/or utilized by EMCO as its paying agent.

20.    Following the withdrawal of Plaintiff's Complaint filed earlier this year against EMCO, Ken Shipping commissioned an investigation of the Defendant EMCO and its relationship with REGENT, the results of which confirm the foregoing, and the details of which are set forth below.

21.    The Defendant REGENT was an offshore, Marshall Island's entity that was formed by or at the behest of EMCO for the purpose of utilizing a corporate form distinct from EMCO to transport cargo and/or receive and make payments for and on behalf of EMCO.

22.    Defendant REGENT was annulled as of February 2003 in the Marshall Islands and ceased from that point forward of having any legitimate or viable corporate existence.

23.    Despite this annulment, EMCO has continued to use the name REGENT to transfer and/or receive funds due from and/or payable to and/or for the benefit of EMCO, and/or to charter vessels for purposes of the transport of steel on a spot basis and/or under COA's from the Black Sea/Turkey to the Persian Gulf.

24.    Most recently, EMCO fixed the M/V KOLA to lift 9,000 tons of steel from the Black Sea/Turkey to Hodeidah, and designated the defunct entity REGENT as charterer.

25.    In addition, inquiries with a main bunker supplier in Turkey have confirmed that EMCO effects payments for bunkers via the defunct entity REGENT, and inquiries with charter brokers familiar with EMCO confirmed that EMCO utilizes the defunct entity REGENT as a chartering vehicle.

26.    Further, a discrete direct inquiry to EMCO resulted in the admission by EMCO that it utilizes REGENT as the entity identified in it chartering transactions.

27.    By virtue of the foregoing, REGENT is the alter ego of and/or paying agent of EMCO, lacks any legitimate corporate form and transfers made by or from REGENT represent the movement of assets of EMCO or assets in which EMCO has an attachable interest.

28.    It is not the general practice in the maritime community, nor in any other business, for an independent company to make or receive payments on behalf of another unrelated independent company, and the use of REGENT by EMCO in the manner describe above reflects REGENT's status as the alter ego of and/or the paying agent of the Defendant EMCO.

29.    The manner in which EMCO dominates and controls REGENT, and has carried on from its Istanbul offices with the use of the defunct entity REGENT reflects EMCO's utter disregard for the actual status of REGENT and in effect renders any business or transfer of assets in the name of REGENT to be business of and/or the transfer of assets to EMCO.

30.    Defendant REGENT, by virtue of the foregoing, has no independent existence apart from EMCO.

31.    The transactions, business and transfer of funds effected in the name of REGENT are conducted from the Istanbul offices of EMCO.

32.    Based on the foregoing, Defendants EMCO and REGENT should be considered a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of Defendants together should be susceptible to attachment and/or restraint for the debts of Defendants EMCO.

### Request for Rule B Relief

33.    Upon information and belief, and after investigation, Defendants EMCO and REGENT cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff Ken Shipping is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant EMCO including but not limited to assets which EMCO is moving or has arranged to move under its alter ego/paying agent REGENT (collectively hereinafter, "ASSETS"), including but not limited to ASSETS at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, further supported by the fact that prior transfers from EMCO or parties acting on its behalf have moved through the New York banking system and on the basis that EMCO has and continues to operate vessels in

worldwide trade under contracts which call for payment in US Dollars which are transferred through the New York banking system.

34.     The total amount to be attached pursuant to the calculations set forth above is **$846,512.92.**

WHEREFORE, Plaintiff Ken Shipping prays:

a.      That process in due form of law according to the practice of this Court may issue against Defendants citing it to appear and answer the foregoing or be defaulted;

b.      That since Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including **$846,512.92** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendants, in either of their names EMCO and/or REGENT (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.      That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award or judgment entered

against the Defendants in the English proceedings, and/or an Order compelling Defendants' participation in those proceedings; and,

d.      For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
        September 22, 2009

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____
        Peter J. Gutowski
        80 Pine Street
        New York, NY  10005
        Tel:  (212) 425-1900
        Fax:  (212) 425-1901
        E-mail:  gutowski@freehill.com

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

      PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

    1.    I am a partner in the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

    2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

    3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                         Peter J. Gutowski

Sworn to before me this
22nd day of September 2009.

Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

NYDOCS1/337772.1

# EXHIBIT 1



Code Name: **"NYPE 93"**
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

TIME CHARTER®
New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th. 1931; October 3rd, 1946;
Revised June 12th. 1981; September 14th 1993.

| | |
|---|---:|
| **THIS CHARTER PARTY, made and concluded in......*Istanbul,*.....................................** | 1 |
| this.....................*1st*...day of...*February*.............~~19~~..*2006*............................................... | 2 |
| | |
| Between...*Messrs. Ken Shipping S.A. Panama As Head Owners*.......................................... | 3 |
| ....................................................................................................................................... | 4 |
| *Owners* of the Vessel described below, and...*Messrs. Emco Shipping Istanbul, Turkiye*.......... | 5 |
| ....................................................................................................................................... | 6 |
| ....................................................................................................................................... | 7 |
| *Charterers*. | 8 |

### Description of Vessel

| | |
|---|---:|
| | 9 |
| Name .*"JUNIOR S"*..................... ~~Flag~~ ...(See Clause 52).......... Built ....*1978*........(year). | 10 |
| ~~Port and number of Registry~~ ................................................................................. | 11 |
| ~~Classed~~.....................................................................~~in~~........................................... | 12 |
| ~~Deadweight~~...................................~~long*/metric* tons (cargo and bunkers, including freshwater and~~ | 13 |
| ~~stores not exceeding~~................................ ~~long's/metric* tons) on a salt water draft of~~.................. | 14 |
| ~~on summer freeboard.~~ | 15 |
| ~~Capacity~~......................................... ~~cubic feet grain~~..................................~~cubic feet bale space.~~ | 16 |
| ~~Tonnage~~........................................ ~~GT/GRT.~~ | 17 |
| ~~Speed about~~...............~~knots, fully laden, in good weather conditions up to and including maximum~~ | 18 |
| ~~Force~~ ...........................~~on the Beaufort wind scale, on a consumption of about....~~ ~~long's/metric*~~ | 19 |
| ~~tons of~~............................................ | 20 |
| | 21 |
| * Delete as appropriate. | |
| *For further description see Appendix "A" (if applicable)* | 22 |

1.    **Duration**                                                                                            23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period    24
of...**(See Clause 84)**..............................................................................................    25
..............................................................................................................    26
..............................................................................................................    27
.......................................................within below mentioned trading limits.                  28


2.    **Delivery**                                                                                             29
The Vessel shall be placed at the disposal of the Charterers at *arrival first sea pilot station Nemrut Bay*   30
*Charterers option passing Canakkale any time day/night/Sundays/Holidays included via Turkey*                 31
*Port(s) and/or Blacksea Port(s)* ..............................................................................    31
*For only 1 Time Charter trip via Turkish port(s) to Red SEA -- PMO Range safe port(s), safe berth(s), safe*   32
*anchorage(s) always afloat with Steels (Steel Prods) always with in I.W.L.*                                   32
*Charterers main cargo is 16,750 metric tons Steel De-bars once founded in bundles of abt 6 mtrs*             32
*length and abt 2 mts unit weight ex Nemrut Bay to Aden but Charterers have right to load Steel/*             32
*/Bagged cargo/Non-imo, non-dangerous harmless generals.*                                                     32
The Vessel on her delivery                                                                                     33
shall be ready to receive cargo with clean-swept *freshwater washed down* holds and tight, staunch, strong and in every way fined    34
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear   35
simultaneously.                                                                                                36
The Owners shall give the Charterers not less than *fixing, 3, 2, 1* days notice of expected date of           37
delivery.                                                                                                      38


3.    On-Off Hire Survey    (See Clause 61)                                                                    39
Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their   40
respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct   41
joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition   42
of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without   43
prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.   44
If either party fails to have a representative attend the survey and sign the joint survey report, such party   45
shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.   46
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.                              47


4.    **Dangerous Cargo/Cargo Exclusions    (See Clause 73)**                                                  48
(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,   49
injurious, flammable or corrosive nature unless carried in accordance with the requirements or   50
recommendations of the competent authorities of the country of the Vessel's registry and of ports of   51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must   52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically   53
excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,   54
..............................................................................................................    55
..............................................................................................................    56
..............................................................................................................    57
..............................................................................................................    58
..............................................................................................................    59

| | 60 |

..................................................................................................................................... 60
..................................................................................................................................... 61
..................................................................................................................................... 62
..................................................................................................................................... 63
..................................................................................................................................... 64

~~(b) If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~.......................................... tons and the Charterers shall provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already-loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

**5.    Trading Limits    (See Clause 74)** 70
~~The Vessel shall be employed in such lawful trades between safe ports and safe places~~ 71
~~within...................................................................................................................................~~ 72
~~.......................................................................................................................................excluding~~ 73
~~...................................................................................................................................~~ 74
~~...................................................................................................................................~~ 75
~~............as the Charterers shall direct.~~ 76

**6.    Owners to Provide** 77
The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for 78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for 79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the 80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and 81
equipment for and during the service, and have a full complement of officers and crew. 82

**7.    Charterers to Provide** 83
The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise 84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory 85
garbage disposal), ~~all communication expenses pertaining to the Charterers' business at cost,~~ pilotages, 86
towages, agencies, commissions, consular charges (except those pertaining to individual crew members 87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel 88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all 89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew 90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while 91
the Vessel is employed under this Charter Party shall be for the Charterers' account, 92
**including crew hotel accommodation, if necessary.** All other fumigations 92
shall be for the Charterers'account after the Vessel has been on charter for a continuous period of six 93
months or more. 94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a 95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard 96
the Vessel. Prior to redelivery the Charterers shall remove ~~their dunnage and~~ fittings at their cost and in 97
their time. 98

**8.    Performance of Voyages** 99
(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance 100

with the Vessel's crew. The Master shall be conversant with the English language and (although 101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards 102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to 103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk 104
and expense, under the supervision of the Master. 105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or 106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if 107
necessary, make a change in the appointments. 108

**9.     Bunkers     (See Clause 72)** 109
(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and 110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with: 111
............................................... long\*/metric\* tons of fuel oil at the price of................................. per ton; 112
......................................tons of diesel oil at the price of .................................. per ton. The vessel shall 113
be redelivered with:............................... tons of fuel oil at the price of........................................ per ton; 114
............................................ tons of diesel oil at the price of ........................................ per ton. 115

\* *Same tons apply throughout this clause* 116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and 117
auxiliaries and which conform to the specification(s) as set out in Appendix A. 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines 119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed 120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed 121
specifications) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners 122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker 123
consumption, nor for any time lost and any other consequences. 124

**10.     Rate of Hire/Redelivery Areas and Notices** 125
The Charterers shall pay for the use and hire of the said Vessel at the rate of $....(See Clause 84).......... 126
U.S. currency, daily, or $.............................. U.S. currency per ton on the Vessel's total deadweight 127
carrying capacity, including bunkers and stores, on .............................. summer freeboard, per 30 days, 128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part 129
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition, 130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at................................................... 131
.(See Clause 75)..................................................................................................................................... 132
...................................................................................................................................................... 133
.......................................................................................unless otherwise mutually agreed. 134

The Charterers shall give the Owners not less than *10,5,2,1*................ days notice of the Vessel's 135
expected date and probable port of redelivery. 136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be 137
adjusted to GMT. 138

**11.**   **Hire Payment**                                                                139

(a)   *Payment*                                                                          140
Payment of Hire shall be made so as to be received by the Owners or their designated payee in    141
.(See Clause 81)................................................... viz........................................................................    142
.......................................................................................................................................................    143
.................................................................................................................................................    144
...................................................................................................................................... .in    145
...............................................................................currency, or in United States Currency, in funds available to the    146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate    147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,    149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to    150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers.    152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the    153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold    154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever    155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157
Charterers' account.    158

(b)   *Grace Period*                                                                     159
Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors    160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161
........*2*..... clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162
failure, and when so rectified within those ......*2*...... days following the Owners' notice, the payment shall    163
stand as regular and punctual.    164

Failure by the Charterers to pay the hire within .......*2*......... days of their receiving the Owners' notice as    165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.    166

(c)   *Last Hire Payment*                                                                167
Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and    169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking    170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for    171
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the    172
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be    173
refunded by the Owners or paid by the Charterers, as the case may be.    174

(d)   *Cash Advances*                                                                    175
Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required    176
by the Owners, subject to *2.5* percent commission and such advances shall be deducted from the hire.    177

The Charterers, however, shall in no way be responsible for the application of such advances.    178

**12.    Berths**    179
The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that    180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat    181
at any time of tide.    182

**13.    Spaces Available**    183
(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can    184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the    185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,    186
apparel, furniture, provisions, stores and fuel.    187

~~(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the~~    188
~~Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a~~    189
~~result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.~~    190

**14.    Supercargo and Meals**    191
The Charterers are entitled to appoint a *one* supercargo, who shall accompany the Vessel at the Charterers'    192
risk and see that voyages are performed with due dispatch, *and provided technical assistance.*    193
He is to be furnished with free    193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of    194
.**(See Clause 80)**...per day. The Owners shall victual pilots and customs officers, and also, when    195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc..    196
Charterers paying at the rate of **(See Clause 80)**................ per meal for all such victualling.    197

**15.    Sailing Orders and Logs**    198
The Charterers shall furnish the Master from time to time with all requisite instructions and sailing    199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine    200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the    201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,    202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts    203
required by the Charterers shall be in the English language.    204

**16.    Delivery/Canceling**    205
If required by the Charterers, time shall not commence before *8th of February 2006*.......and should the    206
Vessel not be ready for delivery on or before *12th February  2006*........but not later than.*24:00* hours,    207
the Charterers shall have the option of cancelling this Charter Party.    208

*Extension of Cancelling*    209
If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready    210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty    211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is    212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will    213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two    214
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date    215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the    216

Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers   217
in accordance with this Clause.   218

**17.    Off Hire**   219
In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency   220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the   221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,   222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless   223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or   224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of   225
hire and overtime, if any, shall cease for the time thereby *actual* lost. Should the Vessel deviate or put back   226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident   227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time   228
of her deviating or putting back until she is again in the same or equidistant position from the destination   229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'   230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,   231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses   232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be   233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time *actual* so lost, and   234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be   235
deducted from the hire.   236

**18.    Sublet    ~~(See also Clause 101)~~**   237
~~Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of~~   238
~~the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this~~   239
~~Charter Party.~~   240

**19.    Drydocking**   241
~~The Vessel was last drydocked .......................................................................................~~   242

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~   243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~   244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~   245

~~*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter~~   246
~~Party.~~   247

*\* Delete as appropriate*   248

**20.    Total Loss**   249
Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or   250
being last heard of) shall be returned to the Charterers at once.   251

**21.    Exceptions**   252
The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the   253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always   254
mutually excepted.   255

**22.   Liberties**                                                                                                  256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels    257
in distress, and to deviate for the purpose of saving life and property.                                         258

**23.   Liens**                                                                                                      259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due           260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on       261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be          262
returned at once.                                                                                                263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,      264
which might have priority over the title and interest of the Owners in the Vessel. The Charterers               265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries        266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.        267

**24.   Salvage**                                                                                                    268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting             269
Owners' and Charterers' expenses and crew's proportion.                                                          270

**25.   General Average**                                                                                            271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any                 272
subsequent modification thereof, in .....*LONDON*...... and settled in *UNITED STATES*.........................  273
currency. *English Law to apply.*                                                                                274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will       275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules        276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason                    277
Clause" as per Clause 31.                                                                                        278

Time charter hire shall not contribute to general average.                                                       279

**26.   Navigation**                                                                                                 280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners            281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,        282
and all other matters, same as when trading for their own account.                                               283

**27.   Cargo Claims**                                                                                               284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club         285
New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent                   286
modification or replacement thereof. *Charterers P and I Club is : Concordia Nv Verzekeringsmakelaars*           287
*Stapelplein 28  9000 Gent  Phn : 09 264 11 11  Telex: 11629  Fax :09 223 91 00- 09  223 39 11*                  287
*İst Office:  Cordia Sigorta Aracilik Hizmetleri A.S.  Nispetiye Cd. Fecri Ebcioglu Sk. Yankl Apt.*
*No:12 D:1 34330  1.Levent / İstanbul  Phn: 0090 212 283 47 76  Fax: 0090 212 283 39 74  Email:*
*Aerul@Cordiainsurance.Com*

28.    Cargo Gear and Lights                                                                        288
The Owners shall maintain the cargo handling gear of the Vessel which is as follows:..............................  289
.(See Clause 52).....................................................................................................................  290
...........................................................................................................................................  291
...........................................................................................................................................  292
providing gear (for alt derricks or cranes) capable of lifting capacity as described. The Owners shall also  293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall  294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If  295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the  296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or  297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that  298
time is actually lost to the Charterers ~~and the Owners to pay stevedore stand-by charges occasioned~~  299
~~thereby,~~ unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If  300
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which  301
case the Vessel shall remain on hire.                                                               302

29.    Crew Overtime                                                                                303
~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~  304
~~the Charterers shall pay the Owners, concurrently with the hire.............................................per month~~  305
~~or pro-rata.~~                                                                                    306

30.    Bills of Lading    (See Clause 76)                                                           307
~~(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates~~  308
~~or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the~~  309
~~Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts.~~  310

~~(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall~~  311
~~indemnify the Owners against all consequences or liabilities which may arise from any inconsistency~~  312
~~between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master~~  313
~~at their request.~~                                                                               314

~~(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and~~  315
~~Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for~~  316
~~any loss, damage, expense or delay howsoever caused."~~                                            317

31.    Protective Clauses                                                                           318
This Charter Party is subject to the following clauses all of which are also to be included in all bills of  319
lading or waybills issued hereunder:                                                                320

(a)    CLAUSE PARAMOUNT                                                                             321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the  322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national  323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall  324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the  325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said  326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such  327
term shall be void to that extent, but no further."                                                 328

and                                                                                                      329

(b)      BOTH-TO-BLAME COLLISION CLAUSE                                                                  330
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any   331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in   332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against   333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents   334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other   335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the   336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.        337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or   338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or   339
contact."                                                                                                340

and                                                                                                      341

(c)      NEW JASON CLAUSE                                                                                342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage        343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the                 344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods.        345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the     346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,     347
and shall pay salvage and special charges incurred in respect of the goods.                                  348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship   349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover       350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,      351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."          352

and                                                                                                      353

(d)      ~~U.S. TRADE– DRUG CLAUSE~~                                                                     354
~~"In pursuance of the provisions of the U.S. Anti-Drug Abuse Act 1986 or any re-enactment thereof, the~~     355
~~Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested~~        356
~~narcotic drugs and marijuana to be loaded or concealed on board the Vessel.~~                              357

~~Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences~~     358
~~of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel~~   359
~~harmless and shall keep them indemnified against all claims whatsoever which may arise and be made~~        360
~~against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,~~  361
~~as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account~~  362
~~and the Vessel shall remain on hire.~~                                                                     363

~~Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this~~   364
~~clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable~~  365

~~time the Vessel is released and at their expense put up the bails to secure release of the Vessel.~~ 366

~~The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the~~ 367
~~event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the~~ 368
~~Vessel's personnel."~~ 369

~~and~~ 370

(e)        WAR CLAUSES    *Conwartime to apply. (See Rider Clause)* 371
~~"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the~~ 372
~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~ 373
~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~ 374
~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~ 375
~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~ 376
~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~ 377

~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~ 378
~~the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not~~ 379
~~exceeding a valuation of................................................ In addition, the Owners may purchase and the~~ 380
~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,~~ 381
~~total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a~~ 382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~ 383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~ 384
~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~ 385
~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~ 386
~~with master, officers and crew as a consequence of such war, warlike operations or hostilities.~~ 387

~~(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the~~ 388
~~Charterers' account."~~ 389

## 32.    War Cancellation
390
In the event of the outbreak of war (whether there be a declaration of war or not) between any two or 391
more of the following countries:...*USA, Great Britain, Germany, France, Russia, China*.................... 392
.............................................................................................................................................................. 393
.............................................................................................................................................................. 394
.............................................................................................................................................................. 395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall 396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after 397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near 398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she 399
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall 400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this 401
Charter Party shall apply until redelivery. 402

## 33.    Ice
403
The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area 404

where lights or lightships have been or are about to be withdrawn by reason of ice. nor where there is 405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and 406
remain in the port or area or to get out after having completed loading or discharging. Subject to the 407
Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her 408
size, construction and ice class. 409

**34.    Requisition** 410

~~Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter~~ 411
~~Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid~~ 412
~~by the said government in respect of such requisition period shall be retained by the Owners. The period~~ 413
~~during which the Vessel is on requisition to the said government shall count as part of the period provided~~ 414
~~for in this Charter Party.~~ 415

~~If the period of requisition exceeds .......................................... months, either party shall have the option~~ 416
~~of cancelling this Charter Party and no consequential claim may be made by either party.~~ 417

**35.    Stevedore Damage** 418
Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all 419
damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their 420
agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such 421
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent 422
of such damage. 423

(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew 424
and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs 425
of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed 426
and if required passed by the Vessel's classification society. 427

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option, 428
before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will 429
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for 430
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the 431
Owners' work. 432

**36.    Cleaning of Holds** 433
The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between 434
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by 435
local regulations, at the rate of...**USD 400.-** per hold. 436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not 437
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver 438
the Vessel with unclean/unswept holds against a lumpsum payment of..**USD 3,000.-**in lieu of cleaning, *including dunnage removal* 439

**37.    Taxes** 440
Charterers to pay all local. State, National taxes and/or dues assessed on the Vessel or the Owners 441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter 442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire ~~(excluding~~ 443

~~taxes levied by the country of the flag of the Vessel or the Owners).~~ 444

**38.    ~~Charterers' Colors~~** 445
~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~ 446
~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~ 447
~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~ 448
~~shall be for the Charterers' account.~~ 449

**39.    <u>Laid Up Returns</u>** 450
The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their 451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum 452
period of 30 days if on full hire for this period or pro rata for the time actually on hire. 453

**40.    <u>Documentation</u>** 454
The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial 456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' 457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear. 459
***Oil pollution covered by vessel's P&I Club.*** 459

**41.    <u>Stowaways</u>** 460
(a)    (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining 461
access to the Vessel by means of secreting away in the goods and/or containers shipped by the 462
Charterers. 463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained 464
access to the Vessel by means of secreting away in the goods and/or containers shipped by the 465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers 466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all ***actual time lost*** 467
claims whatsoever which may arise and be made against them. Furthermore, all time lost and all 468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account 469
and the Vessel shall remain on hire. 470
(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to 471
sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a 472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the 473
Vessel. 474

b)    (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained 475
access to the Vessel by means other than secreting away in the goods and/or containers shipped 476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including 477
fines, shall be for the Owners' account and the Vessel shall be off hire. 478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel 479
by means other than secreting away in the goods and/or containers shipped by the Charterers, 480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel 481
is released and at their expense put up bail to secure release of the Vessel. 482

**42.    Smuggling**    483
In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any    484
fines, taxes, or imposts levied and the Vessel shall be off hire for any *actual* time lost as a result thereof.    485

**43.    Commissions**    486
A commission of.......*1.25* percent is payable by the Vessel and the Owners to *Hanbulk Chartering*......    487
***Plus 1.25 percent commission to Prime Marine***..........................................................................................    488
.........................................................................................................................................................    489
.........................................................................................................................................................    490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.    491

**44.    Address Commission**    492
An address commission of ......*2.5* percent is payable to.***Charterers***....................................................    493
.........................................................................................................................................................    494
.........................................................................................................................................................    495
.................................................on hire earned and paid under this Charter.    496

**45.    Arbitration**    497
~~(a)    NEW YORK~~    498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~    499
~~subject to U.S. Law:~~    500

~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their~~    501
~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~    502
~~agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with~~    503
~~shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of~~    504
~~Maritime Arbitrators Inc.~~    505

~~For disputes where the total amount claimed by either party does not exceed US $..............................~~**    506
~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~    507
~~of Maritime Arbitrators Inc.~~    508

(b)    LONDON    509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree    510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business    511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,    512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No    513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as    514
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder    515
shall be governed by English Law.    515

For disputes where the total amount claimed by either party does not exceed US $..*50,000*..................**    517
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime    518
Arbitrators Association. ***Arbitration should be under LMAA terms.***    519
* Delete para (a) or (b) as appropriate    520
* * Where no figure is supplied in the blank space this provision only shall be void but the other provisions    521

*of this clause shall have full force and remain in effect.*
If mutually agreed, clauses ......**46**....... to ...**102**........... both inclusive, as attached hereto are fully incorporated in this Charter Party.

522
523
524

M/V "JUNIOR S"
## CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006

### Clause 46 - Breaking IWL
Charterers do not have the right to break Institute Warranties Limit.

### Clause 47 - War Risk Insurance
Basic War Risk Insurance premium for worldwide trading shall be for Owners' account and additional premiums including blocking and trapping shall be invoiced to Owners based on quotation from Owners P & I Club for Hull + Machinery and Officers/crew due to the vessel's trading to restricted area shall be for Charterers' account. Owners undertake always to do their utmost to obtain cheapest additional premium (if any at all) from their Underwriters.
Conwartime 1993 terms to apply.

### Clause 48 - Change of Political Situation
Deleted.

### Clause 49-Black List
Owners guarantee that vessel is not Black Listed by any Arab League Countries. Owners guarantee vessel is not Black Listed by trading countries due to vessel's flag/Ownership/operators/age and whatsoever.

### Clause 50 - Panama/Suez Canal transit
Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal Transit and in possession of valid necessary certificates during the currency of this Charter Party to comply with current regulations and requirements of both Canals.

### Clause 51-ITF
Vessel is not ITF fitted: vessel's crew is under vessel's flag rules employment - vessel flying national flag.

### Clause 52 - Vessel's description (all figures about)
M/V JUNIOR S
============
MPPSE/TWEENDECKER   ex name WAKANAMI
BLT MITSUBISHI NAGASAKI 1978 - PANAMA FLAG
CLASS : RINA  / NO ICE CLASS
LOA / BEAM : 162,50 / 24,40 M
S.DWT/DRAFT:22107 MTS/ 10,527 M
CONSTANTS EXCL FW : 300 T
GRN/BLE :975.590 /926.735 CFT
GRT/NRT :15262/8326
SUEZ  GRT/NRT : 15558,16 / 12904,41
H0/HA:4/4 -MC GREGOR HA/COVERS
GEAR: 2 CRANES X 16 TNS (COMBINED 1 X 30 TNS ) SERVING HOLDS NO. 3+4,
    2 CRANES X 13 TNS (COMBINED 1 X 21 TNS ) SERVING HOLDS NO. 1+2,
    1 x 16 t crane serving No. 2 hold STBD side aft.
    1 x 16 t crane serving No. 3 hold Port side forward

ABT 13 KNTS ON ABT 25 TNS IFO 180 CST + 2,5 MDO
            PORT CONSUMPTION IDLE 2,5 T MDO
                WITH GEAR WORKING 4,0 MDO
VSL BURNS MDO IN M.E WHEN MANOUEVRING /STEAMING UNDER RESTRICTED/CONFINED WATERS ,RIVERS,CANALS,STRAITS ETC UP TO MAX BFSC 4 DOUGLAS SEA STATE 3,GOOD WEATHER CONDITIONS AND SMOOTH SEAS - NO SWELL AND NO ADVERSE CURRENTS .

M/V "JUNIOR S"
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

IFO SPECS RME 25  /MGO SPECS DMA  (ALL AS PER ISO 8217 1996 ) BUNKER CAPACITY :1FO 1400 MTS
/MGO 200 TNS BSS 90 PCNT FULL $CO_2$ /GRAIN FITTED/ELECTRICAL VENTILATION - YES

HATCH COVERS SIZE/TYPE  MC GREGOR / HYDRAULIC
              HOLD NO. 1 : 8.10 X 8.00 M
              HOLD NO. 2 : 27.00 X 13.00 M
              HOLD NO. 3 : 27 X 13 M
              HOLD NO. 4 : 16.20 X 13 M

T/DECK COVERS SIZE/TYPE  TYPE: FLUSH T/DECKS FOLDING TYPE
              T/DECK NO.1: 8.10 X 6.00
              T/DECK NO.2: 27 X 13
              T/DECK NO.3: 27 X 13
              T/DECK NO.4: 16.2 X 13

TANK TOP DIM. PER HOLD   HOLD NO.1: FWD 8.60M, AFT 16.00M, LENGTH 14.40M
                               HOLD NO.2: FWD 14.8M, AFT 22.00M, LENGTH
37.00M
                  HOLD NO.3: 20.40 X 37.20 M
                  HOLD NO.4: FWD 20.40M, AFT 13.80M, LENGTH 22.60M

T/DECK DIM. PER HOLD   HOLD NO.1: FWD 7.00, AFT 18.00, LENGTH 14.60
                  HOLD NO.2: FWD 16.00, AFT 20.60, LENGTH 37.00
                  HOLD NO.3: 20.40 X 37.00
                  HOLD NO.4: 20.40 X 22.80

DECK STRENGTHS PER M2   DECK SIDE ON HATCH NO. 1: 2.7 T/M2          DECK SIDES ON NO. 2,3,4 :
3 T/M2

HOMOG LOAD (SUB STAB ):TTL 554 TEU/14 TNS HOMOG          MAX 5 TIERS ON HOLDS / 3 TIERS ON
DECK

STRENGTHS

TANK STRENGTHS
NO 1 HATCH : HATCH TOP:3.2T/M2  TOPT DECK3.2T/M2 UPP TWIN:3.8/M2 BOTTOM :10.2/M2
                SIDE:2.7T/M2   *6.5T/FOLK LIFT WORKING RUN AT TWIN DECK

NO 2 HATCH : HATCH TOP:3.0T/M2          UPP TWIN:4.4/M2 BOTTOM :10.1/M2
                SIDE:3.0T/M2   6.5T/FOLK LIFT WORKING RUN AT TWIN DECK

NO 3 HATCH : HATCH TOP:3.0T/M2          UPP TWIN:4.4/M2  BOTTOM:10.1/M2
                SIDE:3.0T/M2   6.5T/FOLK LIFT WORKING RUN AT TWIN DECK

NO 4 HATCH : HATCH TOP:3.0T/M2          UPP TWIN:4.4/M2 BOTTOM:10.1/M2
                SIDE:3.0T/M2   6.5T/FOLK LIFT WORKING RUN AT TWIN DECK

CONTAINER in TAKE in TEU/FEU:
  STAIR & WEIGHT

| PLACE: | STAIR | 20FEET/WEIGHT | 40FEET/WEIGHT |
|---|---|---|---|
| #2,3&4C/H H/TOP%BEAM | 2 | 15LT | 15LT |

3

# M/V "JUNIOR S"
## CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006

```
#2,3&4C/H TWIN DECK    2          20LT          20LT
#1 C/HOLD    BOTTOM    5          20LT
#2,3&4C/H    BOTTOM    5          20LT          20LT
#3&4C/H  BOTH SIDE    1          15LT
```

OPEND TWIN DECKS:
MAX TEU:

| PLACE: | #4 | #3 | #2 | #lC/H | TTL |
|---|---|---|---|---|---|
| HATCH TOP&SIDE DECK (2 STAIR) | 54 | 72 | 72 | | 198 |
| CARGO HOLD (5 STAIR) | 10 | 10 DO | (5 STAIR) 50 | 100 | 100  250 |
| UPP DECK#3&4C/Hside | (1 STAIR) 2 | 2 | | | |
| GTTL | 106 | 172  172 | 10 | 460 | |

MAX FEU:

| PLACE: | #4 | #3 | #2 | #lC/H | TTL |
|---|---|---|---|---|---|
| HATCH TOP&SIDE DECK (2 STAIR) | 18 | 36 | 36 | | 90 |
| CARGO HOLD (5 STAIR) | 25 | 50 | 50 | | 125 |
| GTTL | 43 | 86 | 86 | | 215 |

REFER PLUGS:
    10PCES ONLY IN #4 HATCH TOP AND SIDE DECK AT AFTER LINE CLOSED TWIN DECKS: MAX TEU:

| PLACE: | #4 | #3 | #2 | #lC/H | TTL |
|---|---|---|---|---|---|
| HATCH TOP&SIDE DECK(2STAIR) | 54 | 72 | 72 | | 198 |
| CARGO HOLD TWIN DECK(2STAIR) | 20 | 40 | 40 | | 100 |
| DO        (5STAIR) | | | 10 | | 10 |
| DO        (2STAIR) | 20 | 40 | 40 | | 100 |
| GTTL | 94 | 152 | 152 | 10 | 408 |

MAX FEU:

| PLACE: | #4 | #3 | #2 | #lC/H | TTL |
|---|---|---|---|---|---|
| HATCH TOP&SIDE DECK(2STAIR) | 18 | 36 | 36 | | 90 |
| CARGO HOLD TWIN DECK(2STAIR) | 10 | 20 | 20 | | 50 |
| CARGO HOLD    (2STAIR) | 10 | 20 | 20 | 50 | |
| GTTL | 38 | 76 | 76 | | 190 |

VENTILATION
EACH HATCH SET 2 ELECT MACHINERY SUPPLY FAN WITH VENTILATION DUCT

ALL DTLS ABT + WOG

OWNERS ADVISED;

⇒ VSL'S DWCC FOR STW=DWT CGO- ABT 20500 MTS
⇒ VSL'S DWCC BSS 10,40 MTS ARRIVAL DRAUGHT FOR ADEN PORT ABT 20-000 MTS SUBJ TO MASTER'S
   RECONF TMRW

4

M/V "JUNIOR S"
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

OWNERS CONFIRM:
- VESSEL IS REGULAR SINGLE DECK/TWEEN DECK GENERAL CARGO CARRIER AND HOLDS CLEAN, CLEAR, UNOBSTRUCTURED COMPARTMENTS BEING GUARANTEED SUITABLE FOR LOAD STEEL REBARS NAS STEEL PRODS
- VESSEL/OWNERS TO COMPLY WITH ISM COMPLIENCES. -VESSEL'S TO BE CLASSED WITH LLOYDS HIGHEST CLASS OF IACS OR EQUIVALENT.
- VESSEL TO BE COVERED WITH P&I CLUB AND WILL BE MAINTAINED DURING THE WHOLE DURATION OF THIS CHARTER.
- VESSEL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG WITHOUT CHARTERERS' WRITTEN CONSENT.
- VESSEL'S HULL AND MACHINERY SHALL BE FULLY MAINTAINED AND WILL NOT BE CHANGED.
- VESSEL'S GEARS TO BE IN GOOD SAFE WORKING ORDER AND TO BE ABLE TO SERVE ALL VSLS HOLDS SIMULTANEOUSLY

OWNERS INFORMED;

1. Vessel's pandi/class/issc/register/doc/smc/h+m certificates. (RCVD)
2. Owner's certificates as requested. (RCVD) 3. Head Owners:
   KEN SHIPPING S.A.
   Calle 50, No. 102 Edificio Universal
   Planta Baja No. 6
   Panama
4. T/C - Disponent Owner - Not Applicable.
5. Agent at present port (Piraeus):
   ALLALOUF HELLAS LTD SHIPPING AGENCIES
   11, AKTI MIAOULI STR.
   PIRAEUS 18510
   GREECE
   TEL:0030210-4113557
   FAX:0030210-4171756
   EML:panagiotis.barkouzos@allalouf.gr
   PIC:Mr. Panagiotis Barkouzos
6. Last disch. cargo : steel products.
7. Bank Details:
   AEGEAN BALTIC BANK SA
   28 DILIGIANNI STR.
   14562 KIFISSIA - GREECE
   BENEFICIARY: KEN SHIPPING S.A.
   A/C NO. : 010038152012
   IBAN NO.: GR 93056100100000010038152012
   SWIFT   : AEBA GR AA

   CORR. BANK: JP MORGAN CHASE
   BANK NEW YORK
   SWIFT   : CHASUS33
8. p+n club of england
9. CLASS : RINA / NO ICE CLASS

## Clause 53 - Deratting Certificate
The vessel shall be delivered with valid deratting certificate or deratting exemption certificate.
If such certificate does not cover the whole period of this charter, costs or renewal of certificate and fumigation, if necessary, shall be for Owners' account. Any detention and all directly related extra expenses incurred thereby shall be also for Owners' account.

5

## M/V "JUNIOR S"
## CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006

**Clause 54 - Quarantined/Radio Pratique**
Normal quarantine time and expenses for the vessel's entering shall be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc., of Master, Officers and crew shall be for Owners' account.

Further, the vessel shall be in possession of valid certificates necessary to prepare radio pratique at port or ports where radio pratique is available.

**Clause 55 - Health Certificate**
The vessel shall be in possession of necessary certificates to comply with safety and health regulations and all current requirements at all port(s) of call during this charter.

**Clause 56 - Grain Loading Certificate**
Deleted.

**Clause 57 - Cargo Gear and Equipment**
The vessel's cargo gear and all other equipment shall comply with the regulations and/or requirements in effect at port(s) of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up to date certificates on board to comply with such regulations and/or requirements.

If stevedores, longshoremen or other labourers are not permitted to work by reason of any failure of the Master, the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, the Owners shall make immediate corrective measures.

The Charterers may suspend hire for actual time lost thereby and any directly related extra expenses including stevedores' standby time up to 1st shift shall be for Owners' account.

**Clause 58 - WWF Requirement**
Deleted.

**Clause 59 - P &I Club**
Owners guarantee that the vessel is Class covered by P & I Club of England.
Owners option their P&I Club surveyors to attend at both loading and discharging ports  and fees/expenses to be for Owners account.
Owners option to appoint surveyor of their P&I Club to perfom preload survey. At both loading and discharging ports and fees/expenses to be for Owners account.

**Clause 60 - Owners' Agents**
Charterer's Agents at ports of call should take care of normal ships' services. Should the vessel require any unusual assistance above and beyond normal husbandry matters, then the Owners are either to appoint their own supervisory agent to attend these matters or negotiate a reasonable fee with Charterers' agent for their services. If agents as per tariff are entitled to an agency fee for handling Owners' matters, same always to be for Owners' account.

**Clause 61 - On/Off Hire Survey**
A joint on/off hire survey is to be carried out with Owners and Charterers each contributing 50 percent to the relevant invoices.

6

M/V "JUNIOR S"
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

**Clause 62 - Oil Pollution**
Deleted.

**Clause 63 - Deviation**
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel, or dry-docking or periodical survey, or deviate from the course of the voyage, caused by sickness of or an accident to the Master, Officers, crew or any person on board the vessel other than persons travelling by the Charterers' request, or by reason of sending stowaway(s) or refugee(s), salvage or by reason of refusal of the Master, Officers or crew to do their duties, or any Owners' matters,
the payment of hire shall be suspended from the time of inefficiency in port or area until the vessel is again efficient in the same position or regains a point of progress equivalent to that the hire ceased hereunder. Bunker consumed while the vessel is off-hire and all extra expenses incurred during such period shall be for the Owners' account.

**Clause 64 - Capture, Seizure, Arrest**
Should the vessel be captured or seized or detained, or arrested by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, unless such capture or seizure to detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents.
Any extra expenses directly related to the vessel incurred by and/or during the above capture or seizure or detention or arrest shall be for the Owners' account.

**Clause 65 - Preparation for loading/discharging**
The vessel's officers and crew shall perform shaping up of the vessel's hatches, cranes and gangway prior to and upon arrival at a port in order to commence loading-and/or discharging operations as soon as possible.

Opening and closing of all hatch covers and erecting and dismantling of shifting boards shall be performed by the Officers and crew in addition to the usual operations performed by them, with free costs to the Charterers and unless prohibited by port regulations.
The Owners and the Master to undertake best efforts to co-operate with the Charterers for the best stowage of cargo.

**Clause 66-P.+C.**
All negotiations and fixture to be kept strictly private and confidential.

**Clause 67 - BIMCO ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of the Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by ISM Code) shall comply with the requirements of ISM Code.
Upon request the Owners shall provide a copy of the relevant Documents Of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in the Charter Party, loss, damage, expenses or delays by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for Owners' account.

**Clause 68 - Bulk Carrier Safety Clause**
Deleted/ Not applicable.

7

**M/V "JUNIOR S"**
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

**Clause 69 - NCB Clause**
Deleted.

**Clause 70 - Hull and Machinery**
Hull + Machinery insured with: 100 % Lloyd's underwriters and the insured value is USD 3,250,000 Three Million Two Hundred and Fifty Thousand US Currency).

**Clause 71 - War Risks**
BIMCO Conwartime 1993. (See clause 99).

**Clause 72 - Bunkers on delivery**
As per clause 9.

Vessel to be delivered with about 350 metric tons IFO and about 210 metric tons MDO and to be redelivered with bunkers as actually onboard. charterers to pay along with first hire payment for estimated consumption i.e. about 200 tons IFO (8 days steaming) and about 80 tond MDO and to relivery vessel with bunkers on board. in case charterers book additional cargo then to replanish bunkers to vessel in order to meet a quantity of 150 tons IFO.

All figures approximately and vessel any difference in quantities to be settles at below prices USD 330/USD 580 respectivily.

Bunker survey to be arranged by the Charterers at their cost , Owners have the option to use their surveyor or vessel's master/chief engineer. Charterers are not responsible for any time lost due to bunkering. Owners to have the right to bunker vessel during time charter without interfering with Charterers operations.

**Clause 73 - Cargo Exclusions**
Alumina, acids, ammonia nitrates, ammonium sulphate, ammunition, aggregates, animals, arms, asbestos, , asphalt, blasting caps, bombs, bonemeal in bulk, black powder, bones, borax, bullion, bitumen, calcium carbide, calcium hydroxide, calcium hydrochloride, calcium hypo/oxy-chloride, canary sheeds, carbon black in bulk, camping caravans and trailers, caustic soda, bulk cement, cement clinkers, clay, charcoal, chilean nitrates, chrome ore, coal (including indian coal), coke, cobble plates, concentrates, copper carbide, copra and its products, cotton and cotton waste, corrosives, creosoted goods, detonator caps, dischlor or phenol, direct reduced iron (dri) and pellets, drugs and narcotics, electrobinder, espartograss, expellers, explosives (including black powder, dynamite, tnt, fireworks, etc.) And combustible materials, fuels, ferrosilicon, fluorspar, fishmeal, hides, gypsum, hbi (hot briquetted iron), ilmenite, indian brown coal, gases, gaseous coal, granite and granite blocks, jewellery, limestone, logs, livestock, mahogany, motorblocks and turnings, motor locks, motor spirits, motor vehicles, manioc + plts, mineral sands, metal borings and cuttings, naphtha, nitroglycerine, nuclear and/or radioactive products/materials/ waste, organic peroxides, ore plts, oilcakes, oily spices, petcoke and products/derivatives, petroleum and its products, potash or caustic potash, potassium chloride palm kernel extraction, pitch/pencil pitch, precious or rare metal or stones, pyrites, poultry, quebracho bark extracts, quicklime, pre-reduced iron ore pellets, radio isotopes, railway wagons, rails, rape sheeds, rockets, resin, salt, saltpetre, scrap, skins and furs, soda ash, species, spodumine, sponge iron, seedcakes, spent-oxide, stone blocks, shavings, sulphur, sulphate in bulk, sunflowerseed expellers and plts, swarf, sludge ore, tar, toxic, turpentine, urea in bulk, zinc ashes, zircon, wheat bran, war material of any kind, and any substances emitting inflammable gases when wet and/or harmful and/or dangerous, and/or injurious and/or inflammable as defined by IMO and/or contraband cargoes and/or and all goods affecting immy or in long run safety of the vessel.

8

M/V "JUNIOR S"
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

If Charterers wish to load any IMO classed cargoes and/or cargoes under Apprendix of the BC Code same must be firstly discussed with Owners in order to check if vessel has relevant requested certificate.

All cargoes to be load/labelled/discharged/stowed/trimmed etc.as per local/IMO B.C. Code/international regulations.

**Clause 74 - Trading Limits and exclusions**
Vessel to trade ice free ports, vessel not to force ice nor to follow ice breakers.

Trading always withing I.W.L. and excluding war/warlike zones (for breaking I.W.L. or calling war/war risk zones same to be agreed separetly between Owners and Charterers and provided same accepted/agreed by Owners undewriters, Charterers to pay for all extra premiums charged by Owners undewriters for breaking I.W.L. or war/war risk zones).

Other trading exclusions:
Great Lakes, Usa, Denmark, Finland, Sweeden, Norway, Iceland (ice class) Amazon River, Vietnam, former Yougoslavia, Iran, Persian or Arabian Gulf and adjuscent waters including the Gulf of Oman North of 24 degrees north, Angola including Cabinda, Israel, Lebanon, Libya (incl. Gulf of Sidra/Sirte), Iraq, Erithrea, Solmalia, Democratic Republic of Congo (formerly Zaire), Sri Lanka, Liberia, Sierra Leone, Bay of Aqaba and Red Sea, Somalia, Republic of Yemen, Pakistan, Oman, Syria, Algeria, Egypt, Indian Ports north of 18 degrees north, west of 73 degrees east, Indonesia excluding transiting vessels, Ivory Coast, Turkish Occupied Cyprus, Australia, New Zeland and their territories, Sea of Azov, White Sea, Cuba, Tasmania, Alaska, Russian far east ports south of 60 degrees north (high risk areas for gypsy moth), Comoros Islands, Abhazia, Haiti, Georgia, North Korea, C.I.S. Pacific Ports, Ethiopia, Nicaragua, Cambodia, Orinocco River, no direct trade between China/Taiwan, NO cargo to be loaded for final destination where U.N. or other sanctions and/or embargo exists.

**Clause 75 - Redelivery**
Redelivery:
Dropping last outward sea pilot 1 safe Port Red Sea – PMO range any time day and/or night Sundays and holidays included. ( intention Aden Port of Yemen)
Vessel is not to trade ice.

**Clause 76 - Bill of Lading**
Charterers Bill(s) of Lading form to be used, in Bill(s) of Lading Charterers identify themselves as carrier and Master or agents to sign Bill(s) of Lading on the carier and/or Master's behalf according to the Charterers/Carriers written instruction but always in full accordance with Mate's Receipt.
At discharging port cargo to be released against original of respective Bills of Lading.
In case originals not arrived in time to discharging port Owners are to agree to discharge cargo against letter of Indemnity as per Owners' P and I Club wording issued/signed by Charterers on their letterhead.
Conbill Bill(s) of Lading to be used and if marked 'Iout' prior vessels arrival at dischport(s) agents to directly·confirm the Owners that all disburstments and Iout expenses have been covered by Charterers/Receivers.

No through/combined transport/Way Bill of Lading to be used.

M/V "JUNIOR S"
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

Neither the Charterers nor their agents shall permit the issuance of any Bill(s) of Lading, Waybill or other document evidencing a contract of Carriage (whether or not signed on behalf of the Owners or on Charterers' behalf or on behalf of any sub-Charterers) whose terms and conditions prejudice this charter party. The Charterers shall indemnify the Owners against any liability, loss or damage which may result by the breach of the foregoing.

When Liner Bs/L are required:
In case 'Liner' Bills of Lading are required then agents at discharging port(s) must confirm directly to Owners office before ship is entering discharging port(s) that all disbursements/costs in connection with discharging have already been paid and Charterers have to confirm to agents with copy to Owners that they have paid the liner costs for discharge. Charterers undertake to cover/pay fully all and any kind of expenses relating to liner out terms, and to keep owners harmless and non responsible for any and all cost/expenses associated with liner out

**Clause 77 - Fumigation**
Deleted.

**Clause 78**
Deleted.

**Clause 79 - NAABSA**
Deleted.

**Clause 80 - Communication Expenses/Victualling/Entertainment**
Cable and communication victualling and entertainment expenses shall be payable by Charterers at the rate of USD 1,300- per month pro rata.

**Clause 81 -Owners' banking details**
AEGEAN BALTIC BANK SA
28 DILIGIANNI STR.
14562 KIFISSIA - GREECE
BENEFICIARY: KEN SHIPPING S.A.
A/C NO. : 010038152012
IBAN NO.: GR 9305610010000010038152012
SWIFT   : AEBA GR AA

CORR. BANK:  JP MORGAN CHASE
BANK NEW YORK
SWIFT   : CHASUS33

**Clause 82 - U.S. Customs 24 Hour Rule**
Deleted.

**Clause 83 - Fumigation not permitted**
See also Clause 77.

**Clause 84 - Charter Duration**
Duration 25/35 days without guarantee..
Hire: USD 8,000 per day pro rata including overtime, payable every 15 days in advance.
1st hire and estimated bunkers to be paid on delivery.

10

M/V "JUNIOR S"
**CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006**

**Clause 85 - Bunkering**
Vessel burns IFO 180 CST (ISO 8217-96 RME 25) and MDO (ISO DMB 8217-96). In case above IFO/MDO quality not existing at the port of bunkering, then Charterers guarantee to supply vessel with IFO: RMF 25 and MDO: DMA or DMX respectively.

**Clause 86 - US Customs Advance notification/AMS Clause for Time Charter Parties**
Deleted.

**Clause 87 - Russian VAT Clause**
In case the vessel makes a voyage through Russian ports for loading/ unloading cargo the Charterers shall pay Russian value added tax (VAT) on hire in accordance with Russian Federation Tax Code. VAT to be applied for the period beginning since loading cargo in foreign port till the end of discharging this cargo at port of destination if loading/unloading occurred in Russian port during the voyage.

**Clause 88 - U.S. Security Clause for Time Chartering**
Deleted.

**Clause 89 - Calling Constanza**
Deleted

**Clause 90 - Double Banking**
No double banking allowed.

**Clause 91 - Hatch Covers**
The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatch covers are watertight. All hatches are to be carefully attended by the crew to prevent leakage. The Charterers have the option to perform hose/pressure/ ultrasonic or similar test on all hatches at any time during the Charter. If any deficiencies found same to be immediately rectified.

**Clause 92 - Weather Routing**
The Charterers may supply an independent weather routing bureau advise to the Master during voyages and the Master shall comply with the reporting procedure of the weather bureau, however the Master remains responsible for the safe navigation and choice of route.
Evidence of weather conditions shall be taken from vessel's deck logs and independent weather bureaus reports. In the event of a discrepancy between the deck logs and the independent weather bureau reports shall be final and binding on both parties.

**Clause 93 - General Appearance**
Throughout the duration of this Charter, Owners to maintain the vessel's exterior hull, accommodation block, main deck. hatches and hatch covers in a clean and well painted condition. Furthermore all plimsoll and draft marks are to be clearly marked and readable at all times.

**Clause 94 - Additional Equipment, Fittings**
The Charterers shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo always at class'/Master's satisfaction and approval. Such work shall be done at the Charterers expense and time and the Charterers shall remove such equipment and fittings at their expense and time prior to redelivery, if Owners so request. The meaning of this clause shall include but not limited to welding of padeyes for lashing/securing of cargo in holds/on deck.

M/V "JUNIOR S"
CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006

**Clause 95 - Grabs**
Deleted.

**Clause 96 - Bulldozers**
Charterers have the privilege of using bulldozers in vessel's holds. However unit weight of bull dozers will not exceed vessel's tank top strength and same are rubber wheeled.

**Clause 97 - Dry Docking**
Deleted.

**Clause 98 - U.S. Trade - Unique Bill of Lading Identifier Clause**
Deleted.

**Clause 99 - War Risk Clause for Time Charters, 1993 (Code name: CONWARTIME 1993)**
1) For the purpose of this Clause, the words:

    a) "Owners" shall include the ShipOwners, bareboat Charterers, disponent Owners, Managers or others operators who are charged with the vessel, and the Master, and

    b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2) The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in anyway whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

4)

    a) The Owners may effect War Risk Insurance in respect of the Hull and Machinery of the vessel and their other interest (including, but not limited to, loss of earning and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

    b) If the Underwriters of such insurance should require payment of premiums an/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be

12

## M/V "JUNIOR S"
## CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006

reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6) The vessel shall have liberty:
   a) To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

   c) To comply with the order, directions or recommendations of any War Risks Underwriters who have the authority to give the same under the terms of the War Risk Insurance;

   d) To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue an give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

   e) To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

   f) To divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7) If in accordance with their rights under the foregoing provisions of this clause, the Owners shall refuse to proceed to the loading -or discharging ports, or any one or more of them, they shall immediately inform the Charterers.
   No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### Clause 100 - Vessel's Performance Clause
Vessel must maintain full speed/consumption as per Charter Party warranty during this whole voyage unless otherwise instructed. In the meanwhile, whenever vessel's running speed goes down more than 1 knot during consecutive 24 hours, Captain must immediately advise Charterers of reason thereof in addition to regular noon reports.

13

## M/V "JUNIOR S"
## CHARTER PARTY DATED, ISTANBUL 1ST OF FEBRUARY 2006

**Clause 101 - Subletting Clause**
Deleted.

**Clause 102 - ISPS Clause for Time Charter Parties**

a)

i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "The Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "The Company", Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate ( or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO),

ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "The Company" to comply with the requirements of the ISPS Code or this Clause shall be for Owners' account.

b)

i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter parties they enter into during the period of this Charter Party contain the following provision;

ii) "The Charterers shall provide the Owners with their full style contact details and where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

iii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

d) All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Owners**                                        **Charterers**